**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JANET NAWROCKI and H.O.P.E., INC., d/b/a HOPE FAIR HOUSING CENTER, an Illinois Not-for-Profit Corporation; | Case No.  20-CV-1517 |
| Plaintiffs, | |
| v. | Jury Trial Demanded |
| OAK BROOK TOWERS CONDOMINIUM ASSOCIATION, LIEBERMAN MANAGEMENT SERVICES, FIRSTSERVICE RESIDENTIAL ILLINOIS 2, INC., and RICHARD KRILICH; | |
| Defendants. | |

## COMPLAINT

Janet Nawrocki and HOPE Fair Housing Center, Inc., by and through their attorneys,

Soule, Bradtke & Lambert, state the following Complaint against Defendants as follows:

## NATURE OF THE ACTION

1.      This is a textbook case of improper denial of reasonable accommodation, squarely

at odds with the Fair Housing Act and the Joint Statement of the Department of Housing and

Urban Development and the Department of Justice, *Reasonable Accommodation under the Fair

Housing Act* (May 17, 2004).  Defendants have denied Plaintiff Nawrocki, a member of the

Association and unit owner, her requested reasonable accommodation, an assigned parking space

close to the entry door at the back of the building at Oak Brook Towers.  At all stages following

Ms. Nawrocki's initial May 29, 2019 request for reasonable accommodation, Defendants have

failed to engage in a bona fide interactive process by delay, obfuscation and outright denial,

despite the best efforts of HOPE Fair Housing Center, Inc., which efforts have been exhaustive.

1

2.     Defendants also fail to comply with applicable specifications for accessible[1] parking spaces, in violation of the Fair Housing Act.   Defendants have to date rejected HOPE Fair Housing, Inc.'s requests that they provide compliant accessible parking spaces.

3.     Plaintiffs seek declaratory and permanent injunctive relief  requiring Defendants to (a) grant Plaintiff Nawrocki the reasonable accommodation she requested, (b) modify its parking area to conform with applicable accessibility standards, (c) to reform their contracts, policies, and procedures to conform to legal mandates and abolish discriminatory treatment in the conditions of residency, and (d) pay Plaintiffs monetary damages (actual and punitive), costs, and reasonable attorneys' fees and expenses.

4.     This action is brought pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. §3601 *et seq.*.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this case pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343.

6.     Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 because the Plaintiffs and the Defendants reside within the District and Eastern Division and the events or omissions giving rise to the claims occurred in the District.

## PARTIES

7.     Plaintiff Janet Nawrocki is a citizen of the United States who resides in Oak Brook, DuPage County, Illinois.

---

[1] The Fair Housing Act uses the term "handicap" and courts have used that term or "disabled", both of which have become disfavored terms in recent years due to bearing negative connotations.  Throughout this complaint, plaintiffs use the term "a person with a disability" or "accessible".

2

8.     Ms. Nawrocki is a person with a disability as defined by 42 U.S.C. §§ 3602(h)(1)-
(3) in that she has a physical impairment which substantially limits one or more of her major life
activities and she has a record of such an impairment.

9.     Ms. Nawrocki is substantially limited in her ability to engage in several major life
activities, including standing and walking.

10.     Due to her disability, Ms. Nawrocki is at risk for falling when walking and
becoming incapacitated and experiencing pain as a result of walking too far of distances.  Ms.
Nawrocki has obtained a permanent placard for her vehicle as a result of her disability, which is
prominently displayed in her vehicle when at the subject property.

11.     Plaintiff H.O.P.E., Inc., doing business as HOPE Fair Housing Center ("HOPE"),
is a private, non-profit corporation incorporated under the laws of Illinois with its principal place
of business located at 202 Willow, Suite 203, Wheaton, Illinois 60187, DuPage County, Illinois.

12.     HOPE's mission includes advocating for the rights of people with disabilities to
accessible housing.  HOPE works to eliminate housing discrimination and to ensure equal
opportunity for all people through leadership, education and outreach, membership services,
public policy initiatives, advocacy, investigation of fair housing violations, and
enforcement.  One of HOPE's goals is the promotion of accessible housing.

13.     Defendant Oak Brook Towers Condominium Association ("the Association") is
an Illinois corporation organized under the Illinois Condominium Property Act 765 ILCS 605/1
*et seq.*, covering the property at issue and its common areas including parking lots and parking
rules at 40 N. Tower Road, Oak Brook, Illinois 60523.

14.     Defendant Lieberman Management Services is or was an Illinois Corporation
hired by the Association as Manager of the property in question.   Lieberman Management

Services may now be operating its business as FirstService Residential Illinois 2, INC., an Illinois Corporation.

15.     Defendant FirstService Residential Illinois 2, INC. is an Illinois Corporation which, on information and belief, acquired Lieberman Management Services during the course of events at issue in this case.  The terms of the acquisition are not yet known.

16.     Defendant Richard Krilich is the Manager acting on behalf of the Oak Brook Towers Association.  On information and belief, Mr. Krilich may be or is employed by Lieberman Management Services, now known as (or doing business as) FirstService Residential Illinois 2, INC.  Otherwise, Mr. Krilich is employed by the Association.  Krilich communicated to Ms. Nawrocki under the auspices of Lieberman Management Services.

## FACTUAL ALLEGATIONS

17.      Ms. Nawrocki owns and resides in a condominium unit in the building located at 40 N. Tower Road in Oak Brook, Illinois.  Her unit is served by an elevator that is close to the tenant entrance in the back parking lot.

18.     Defendants were generally aware that Ms. Nawrocki is a person with a disability, based, at least, on her yellow permanent disability auto placard.

19.     On May 29, 2019, Ms. Nawrocki wrote to Defendant Association and requested as a reasonable accommodation that one of the parking spaces in the row closest to the back entrance be assigned to her.   Ms. Nawrocki confirmed in writing to Defendant Association that she had been issued a yellow disability placard as a result of a permanent disability.  Ms. Nawrocki explained that, by the time she arrives home from work, parking spaces on a first come, first served basis close to the tenant entrance that leads to the elevator and her apartment door are taken, and she is required to park at a far end of the lot near the trees and walk an

unacceptably long distance.    Spaces in the parking lot at the front of the building are far from the

elevator and unusable for Ms. Nawrocki.

      20.     Defendants failed to respond to Ms. Nawrocki's May 29, 2019 request and

therefore failed both to engage in an interactive process or provide the reasonable

accommodation requested.

      21.     Ms. Nawrocki contacted HOPE Fair Housing Center for assistance.  On July 30,

2019, HOPE sent a letter to then management company Hillcrest Property Management, again

requesting a reasonable accommodation: a designated parking space.

      22.     On August 19, 2019, HOPE received a letter from Defendant Krilich, manager of

Oak Brook Towers Condominium Association, claiming the opposite of what the Fair Housing

Act required, that it might be discriminatory for the Association to specifically designate a

parking space for Ms. Nawrocki, as requested.  Thus, Ms. Nawrocki's request for a reasonable

accommodation of a designated parking space was not properly addressed and was denied.

      23.     Defendant Krilich also claimed that there are a total of 5 designated parking

spaces at the complex for "handicapped users" on a first-come, first-served basis.  However, two

are apparently at a far distance and located in a different parking lot than the one close to the

back tenant door and elevator that leads up to Ms. Nawrocki's unit door.  Three spaces described

by Krilich in the lot used by Ms. Nawrocki are dangerous and unsuitable for persons with

disabilities, as well as entirely non-compliant with the Fair Housing Act in that they are not the

proper width, do not have an adjacent access aisle, lack the required signage, and are blocked by

lack of useable or accessible routes to the tenant door.

      24.     One side along the three parallel first come, first served spots claimed by

Defendants to be purportedly "for handicapped users" is directly abutted and obstructed by a

curb and grass median; the other side abuts a major driving lane. Thus, neither the driver or passenger can safely exit the vehicle or safely traverse the distance between the vehicle and the building entrance: either there is a curb and a soft surface, or traffic.

25.     On August 21, 2019, HOPE Fair Housing Center responded to Defendant Krilich, stating that his letter failed to address the specific accommodation Ms. Nawrocki had requested, as Defendants were required to do under the Fair Housing Act. Additionally, HOPE stated that the Association failed to demonstrate that Ms. Nawrocki's requested accommodation posed an undue financial and administrative burden on the Association. HOPE also addressed and explained various legal principles pertaining to reasonable accommodation requests applicable in this situation. HOPE further notified Defendants that the claimed "handicap user" parking spaces are not safe and are non- compliant.

26.     Four months after the request for reasonable accommodation of a designated parking space near the tenant door, on September 13, 2019, HOPE Fair Housing Center received a letter from counsel for the Oak Brook Towers Condominium Association. Instead of responding to the accommodation request, the attorney went back to square one and asked for medical documentation of Ms. Nawrocki's disability.

27.     Ms. Nawrocki provided the requested medical documentation to Defendants on or about September 23, 2019, which was in addition to her previous notification to the Association of her permanent disability placard, which in Illinois could only have been obtained by demonstration of a permanent disability.

28.     Having still heard nothing from Defendants about the reasonable accommodation requested, HOPE inquired again on October 22, 2019 about Ms. Nawrocki's reasonable accommodation request. In response, the Association, through its counsel, sent an email failing

6

to grant the request, failing to state any burden on the part of defendants, and claiming the request for accommodation was unclear. Therefore, HOPE's Director of Enforcement (a non-attorney) contacted Defendants' counsel on November 6, 2019 to *again* review and *again* explain the request, including explaining that Ms. Nawrocki did not feel safe using at all or having designated one of the three non-compliant parallel spaces, which would not address in any event the first come, first served problem of lack of availability. It was clearly explained again that Ms. Nawrocki simply was requesting one of the spaces in the row nearest the back door be assigned to her. On November 7, 2019, Defendants' counsel informed HOPE's Director of Enforcement that the Board was considering the request.

29.     HOPE's Director of Enforcement contacted Defendants' counsel again to follow up on November 13, 2019. On November 14, 2019, Defendants' counsel contacted HOPE's Director of Enforcement by phone and inexplicably stated that the Association Board did not understand Ms. Nawrocki's request. By way of denying the request, counsel suggested — without identifying any burden to the Association in granting the accommodation Ms. Nawrocki requested — that Ms. Nawrocki at her own cost purchase a parking space in an exclusive indoor parking area.

30.     Exhibit A attached hereto consists of a publicly available and commonly referenced guidance document for property owners and managers, landlords, residents and lay persons concerning the Fair Housing Act and accommodations, *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act*, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf, that clearly reiterates that condominium properties are covered, and includes a specific guidance

7

example at page 6, as follows:

> "**Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident."

31.     HOPE provided a reference and link to this Joint Statement to Defendants Krilich and Lieberman Management Services in its August 21, 2019 letter. The Joint Statement also confirms that a delay in providing a response to an accommodation request may be deemed to be failure to provide a reasonable accommodation.

32.     Finally, HOPE's Director of Enforcement wrote to Defendant Krilich on December 12, 2019 summarizing the failed and futile reasonable accommodation efforts of Ms. Nawrocki and HOPE. (Exhibit B) HOPE stated, among other things, that "[i]t still remains the case that the Association has not adequately addressed Ms. Nawrocki's actual request for a reasonable accommodation, other than to say that the Board rejected it. We are disappointed that Ms. Nawrocki remains unaccommodated for a request that is medically necessary. I remain available to discuss this matter with you further on behalf of Ms. Nawrocki." (Exhibit B)

33.     To date of this filing, Defendants have not said or done anything further.

34.     Based on the foregoing, Defendants are in violation of 42 U.S.C. Section 3604(f)(3)(B) of the Federal Fair Housing Act, in that they: failed to fully engage in a meaningful interactive reasonable accommodation process; failed to provide any accessible parking in the tenant parking lot; and refused to provide Plaintiff Nawrocki with her requested reasonable accommodation.

## DAMAGES

35.     Plaintiff Janet Nawrocki has suffered and continues to suffer on a continuing and ongoing basis loss of her civil rights, physical pain and anguish, emotional injury, humiliation, and embarrassment as a result of the discriminatory conduct of Defendants.

36.     Plaintiff HOPE has been directly and substantially injured as a result of the above discriminatory and retaliatory acts of Defendants in that:

        A.     HOPE has been frustrated in its mission to eradicate discrimination in housing and in carrying out the programs and services it provides, including advocating for the rights of people with disabilities to accessible housing, educating the public about fair housing rights and requirements, educating and working with industry groups on fair housing compliance, providing assistance to individuals and families looking for housing or affected by discriminatory housing practices, and eliminating discriminatory housing practices; and

        B.     HOPE's limited resources have been diverted from providing these services to efforts directed to investigate, address, and counteract Defendants' discriminatory and retaliatory conduct.

        C.     Defendants conduct is intentionally discriminatory.

## JURY TRIAL DEMANDED

37.      Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant each of them the following relief:

        A.     Enter a declaratory judgment that defendants' unlawful discriminatory conduct has injured Plaintiffs in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §3604 et. seq.;

B.     Award such damages under the Fair Housing Act of 1968, as amended, as will fully compensate Plaintiff Nawrocki for her injuries incurred as a result of Defendants' discriminatory conduct as alleged herein;

C.     Award plaintiff HOPE damages under the Fair Housing Act of 1968, as amended resulting from frustration of mission and diversion of resources and any other relief permissible under law;

D.     Award Plaintiffs their costs and attorneys' fees incurred herein, pursuant to 42 U.S.C. §3613(c)(2);

E.     Award Plaintiffs punitive damages;

F.     Award Plaintiffs all other applicable relief available to them under the Fair Housing Act, including but not limited to equitable relief as appropriate to remedy past and future violations of the Fair Housing Act; and

G.     Grant such other relief as the Court deems appropriate.

Respectfully Submitted,
*/s/ Jennifer K. Soule*

Jennifer K. Soule
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street, Suite 100
Geneva, IL 60134
*Attorneys for Plaintiffs*

Dated: March 2, 2020

10

# EXHIBIT A





**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

**JOINT STATEMENT OF**
**THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**AND THE DEPARTMENT OF JUSTICE**

***REASONABLE ACCOMMODATIONS UNDER THE***
***FAIR HOUSING ACT***

<u>**Introduction**</u>

      The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]      The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]      The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* <u>Bragdon</u> v. <u>Abbott</u>, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

[3]      42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

**Questions and Answers**

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]     Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of l973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/ sect504faq.cfm#anchor272118).

[5]     The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities  42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6]     42 U.S.C. § 3604(f)(3)(B). HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R.  § 100.204.

make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7]   With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

**2.  Who must comply with the Fair Housing Act's reasonable accommodation requirements?**

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage.  Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services.  Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions.  *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002).  Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings.  The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

**3.  Who qualifies as a person with a disability under the Act?**

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

---

[7]      This Statement does not address the principles relating to reasonable modifications.  For further information see the HUD regulations at 24 C.F.R. § 100.203.  This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8]  This list of major life activities is not exhaustive. *See e.g.*, Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

**4.  Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?**

No, juvenile offenders and sex offenders, by virtue of that status, are not persons with disabilities protected by the Act.   Similarly, while the Act does protect persons who are recovering from substance abuse, it does not protect persons who are currently engaging in the current illegal use of controlled substances.[9]  Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

**5.  How can a housing provider determine if an individual poses a direct threat?**

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general.  A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts).  The assessment must consider:  (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat.  Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm).  In such a situation, the provider may request that the individual document

---

[8]     The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity.  See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 122 S. Ct. 681, 692, 693 (2002).  If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job.  *See* Sutton v. United Airlines, Inc., 527 U.S. 470, 492 (1999).

[9]     *See*, *e.g.*, United States v. Southern Management Corp., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

how the circumstances have changed so that he no longer poses a direct threat.   A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy.  The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1**:  A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence.  On her application to rent an apartment, a woman notes that she currently resides in Cambridge House.  The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism.  Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant.  The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct.  The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit.  However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references.  If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2**:  James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat.  The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents.  Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat.  Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process.  James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication.  Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability.  The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and

- 5 -

periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

### 6. What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

**Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

**Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing

- 6 -

provider must make an exception to its "no pets" policy to accommodate this tenant.

**7. Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?**

Yes. A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation. In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations. The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

**Example:** As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service. Accordingly, the requested accommodation may not be reasonable. If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site. Such an accommodation would not involve a

- 7 -

fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

**8. What is a "fundamental alteration"?**

A "fundamental alteration" is a modification that alters the essential nature of a provider's operations.

**Example:** A tenant has a severe mobility impairment that substantially limits his ability to walk. He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability. The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations. The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

**9. What happens if providing a requested accommodation involves some costs on the part of the housing provider?**

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations. The financial resources of the provider, the cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative

- 8 -

burden.

**10. What happens if no agreement can be reached through the interactive process?**

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation. If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law- and decide if the housing provider violated that law. For more information about the complaint process, see question 19 below.

**11. May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?**

No. Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

**Example 1**: A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes. He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises. It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes. Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter. However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property. If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**Example 2:** Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for

the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**12.  When and how should an individual request an accommodation?**

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability.  She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one.  However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time.  A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf.  An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation."  However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing.  This will help prevent misunderstandings regarding what is being requested, or whether the request was made.  To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made.  However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

> **Example:**  A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend.  The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

**13.  Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?**

- 10 -

No.  The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests.  However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted.  If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling.  See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

**14.  Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?**

No.  A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made.  A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

**15.  What if a housing provider fails to act promptly on a reasonable accommodation request?**

A provider has an obligation to provide prompt responses to reasonable accommodation requests.  An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

**16.  What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?**

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities.  Housing providers may, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- An inquiry into an applicant's ability to meet the requirements of tenancy;

- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;

- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and

- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

**17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation**?

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information

about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

> **Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

> **Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

> **Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

**18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?**

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[10] or a credible statement by the individual). A doctor or other

---

[10]    Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, <u>Cleveland</u> v. <u>Policy Management Systems Corp</u>, 526 U.S. 795, 797 (1999)

medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19. If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

• By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

• By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

• By mailing a completed complaint form or letter to:

    Office of Fair Housing and Equal Opportunity
    Department of Housing & Urban Development
    451 Seventh Street, S.W., Room 5204
    Washington, DC 20410-2000

---

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

> U.S. Department of Justice
> Civil Rights Division
> Housing and Civil Enforcement Section – G St.
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.

- 15 -

# EXHIBIT B



**FAIR HOUSING CENTER**

Alton J. Mitchell
*President*

Anne V. Houghtaling
*Executive Director*

202 W. Willow . Suite 203 . Wheaton, IL 60187

**Phone:** 630-690-6500
**Fax:** 630-690-6586

**December 12, 2019**

<u>VIA CERTIFIED MAIL/RETURN RECEIPT REQUESTED</u>

Richard Krilich, Manager
Oak Brook Towers Condominium Association
Lieberman Management Services
25 Northwest Point Boulevard
Elk Grove Village IL 60007

RE:    Reasonable Accommodation request for Ms. Janet Nawrocki, 40 N. Tower
Road, #9L Oak Brook, IL 60523

Mr. Krilich:

HOPE Fair Housing Center ("HOPE") is contacting you to confirm the status of a request for a reasonable accommodation for Janet Nawrocki, as set out in HOPE's July 30, 2019 letter to Oak Brook Towers Condominium Association. HOPE requests that its earlier correspondence and this letter be made a part of the Association's files as regards Ms. Nawrocki and her unit. HOPE's July 30, 2019 letter stated that, due to Ms. Nawrocki's disability, it is extremely difficult for her to walk long distances. Therefore, in order to reach her unit with the least amount of walking, she was requesting as a reasonable accommodation to park in an existing parking space at the rear of the building, where the door is closest to the elevator. Specifically, HOPE requested that one of the permit-only parking spaces closest to the rear entrance be assigned to Ms. Nawrocki and that the parking space be clearly marked as "reserved" or "assigned".

The Association did not address this request, but, instead, in a letter dated August 14, 2019, suggested Ms. Nawrocki park in one of the parking spaces for "handicapped users" (presumably if available on an ad hoc basis). HOPE responded to your letter on August 21, 2019, explaining that the Association did not address Ms. Nawrocki's particular accommodation request, nor demonstrate that Ms. Nawrocki's requested accommodation posed an undue financial and/or administrative burden. Additionally, HOPE requested that Oak Brook Towers address non-compliant features of the three "handicapped users" spaces at the rear of the building. The problems with the "handicapped users" spaces have never been addressed.

On September 10, 2019, the Association's attorney, Pam Park, with Kovitz, Shifrin & Nesbit, wrote to request reliable medical documentation in support of Ms. Nawrocki's reasonable accommodation request for a designated parking space. Ms. Nawrocki provided the association with a letter from her doctor documenting her need on September 23, 2019.

After not receiving a response, HOPE mailed a letter to your attorney, Ms. Park, on October 22, 2019, requesting a response. Ms. Park responded on November 5, 2019, stating that it was unclear to her what parking space Ms. Nawrocki was seeking as an accommodation. HOPE contacted Ms. Park via telephone on November 6, 2019, to again explain where Ms. Nawrocki was requesting to park. HOPE explained that Ms. Nawrocki does not feel safe parking in any of the 3 "handicapped user" spaces near the rear entrance of the building because there is a curb on one side and a driveway on the other, and no access aisle. HOPE described where Ms. Nawrocki's desired designated space would be, in the general lot, first lane, the second or third space, as either of those spaces would give Ms. Nawrocki the safest, unobstructed route to the rear entrance door. Unfortunately, Ms. Park informed HOPE on November 14, 2019, that the Association Board rejected Ms. Nawrocki's request for reasonable accommodation. Ms. Park then went back to the previously rejected Association proposal about parking in the essentially inaccessible/unsafe and non-compliant "handicapped user" spaces. Ms. Park then proposed that Ms. Nawrocki could purchase at her own cost a space in an indoor parking area. Unfortunately, this suggestion that Ms. Nawrocki pay for a reasonable accommodation in the absence of any burden to the Association is not appropriate. It still remains the case that the Association has not adequately addressed Ms. Nawrocki's actual request for reasonable accommodation, other than to simply say the Board rejected it.

We are disappointed that Ms. Nawrocki remains unaccommodated for a request that is medically necessary. I remain available to discuss this matter with you further on behalf of Ms. Nawrocki.

Sincerely,

Josefina Navar, Director of Enforcement

CC: Janet Nawrocki